**SUPERIOR COURT**
**OF THE**

PAUL R. WALLACE
JUDGE

NEW CASTLE COUNTY COURTHOUSE
500 N. KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
(302) 255-0660

Date Decided: September 3, 2021
Date Issued:  September 10, 2021

Mr. Anthony A. Figliola, Jr., Esq.
Greto Law
715 N. Tatnall Street
Wilmington, Delaware 19801

Mr. John W. Downs, Esquire
Department of Justice
Deputy Attorney General
820 N. French Street, 7th Floor
Wilmington, Delaware 19801

RE:  *State of Delaware v. Anthony Dale*
     ID No. 1909010294

Dear Counsel:

This Letter Order memorializes the Court's ruling made at the September 3, 2021 status conference with respect to Defendant Anthony Dale's Motion to Subpoena Records and Conduct an *In Camera* Review.  Mr. Dale's motion is granted, but pursuant to *Burns v. State* and its progeny, is limited in scope to safeguard the witness, Indi Islam's, privacy interests in her confidential medical or other treatment records.[1]  In balancing Mr. Dale's Sixth Amendment confrontation right with Ms. Islam's privacy rights in her protected medical or other treatment records, the permissible scope of production includes *only* those portions of the records that: (1) discuss her memory, or lack thereof, of the crimes central to this case; and (2) any diagnosis and/or subsequent treatment following her broken jaw injury and any memory loss associated therewith.

---

[1]  *Burns v. State*, 968 A.2d 1012 (Del. 2009) (en banc).

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A. THE PARTIES

The Motion to Subpoena Records was originally filed by Mr. Dale's co-defendant, Maleke Brittingham.[2]  Mr. Dale joined in this motion.[3]  Mr. Brittingham later entered into a plea agreement and is currently awaiting sentencing.[4]  Mr. Dale remains the sole active defendant in this case, and accordingly, remains the sole party pursuing the production of documents set forth in the original Motion to Subpoena Records.

Ms. Indi Islam is a co-defendant in this matter who also entered into a plea agreement with the State.[5]  She pleaded guilty to Attempted Murder in the Second Degree, with an agreement to testify in the trial of her co-defendants, Messrs. Dale and Brittingham.[6]  As such, Ms. Islam is a key State witness against Mr. Dale.

Mr. Dale seeks to obtain healthcare and other treatment records from certain identified providers of healthcare or related treatment services to Ms. Islam; such treatment occurring after the Printz Market shooting.  Those providers are: (1) State of Delaware Department of Correction (DOC); (2) Christiana Care Health Services (CCHS); (3) Psychotherapeutic Services/Madre House Transitional Housing; and

---

[2]  Mot. to Subpoena Records, *State v. Maleke Brittingham*, ID No. 1909010295 (Del. Super. Ct. Feb. 13, 2021).

[3]  Letter to Join, *State v. Anthony L. Dale*, ID No. 1909010294 (Del. Super. Ct. Apr. 27, 2020).

[4]  Plea Agreement and TIS Guilty Plea Form, *State v. Maleke Brittingham*, ID No. 1909010295 (Del. Super. Ct.  June 25, 2020).

[5]  Mot. to Subpoena, Appx. 2, Ex. E, Indi Islam Plea Agreement.

[6]  *Id.*

(4) the YWCA Delaware Home-Life Management Center.

## B. THE RELEVANCE OF MS. ISLAM'S MEDICAL AND TREATMENT RECORDS

On June 7, 2013, the Printz Market at 2715 Governor Printz Boulevard in Wilmington was robbed by three men.[7]  During the robbery, two men were shot— one of them, Anthony Berry, fatally.[8]  Soon thereafter, on June 19, 2013, Mr. Dale was arrested by the Wilmington Police Department for firearms charges.[9]  When questioned, Mr. Dale told police that his cousin, Maleke Brittingham, had borrowed his firearm, thereby implicating him in the Printz Market shooting.[10]  Police subsequently searched both Mr. Brittingham's and Mr. Dale's apartments, but no evidence was found that could link either of them to the slaying of Anthony Berry.[11] After the fruitless searches, the case went cold for about five years when, in May of 2018, police had occasion to interview Ms. Islam.[12]

Ms. Islam had numerous conversations with Wilmington police investigators during the summer of 2018 that ultimately led to her admitting her involvement in the 2013 Printz Market robbery.[13]  During Ms. Islam's several interviews with

---

[7]    Mot. to Subpoena, p. 1.

[8]    *Id.*

[9]    *Id.*

[10]    *Id.*

[11]    *Id.*

[12]    *Id.* at 1-2.

[13]    *Id.* at 2.

investigators—the content of which Mr. Dale suggests are inconsistent in the reporting of details and also evidence questionable periods of lucidity—she identified and described Mr. Dale's and Mr. Brittingham's involvement in the Printz Market murder.[14]  Ms. Islam was charged for her own involvement in the robbery and has pleaded guilty to Attempted Murder in the Second Degree, with an agreement to testify in the trial of Messrs. Dale and Brittingham.[15]  As a condition of her plea, she is to complete a substance abuse evaluation and adhere to any prescribed treatment plan.[16]

Ms. Islam's piecemeal interviews spanned the course of a few months and were conducted in numerous locations, including Baylor Women's Correctional Institution (BWCI), the YWCA shelter, the police station, and the Madre House.[17] Prior to investigators' first interview with Ms. Islam at BWCI, she had recently been admitted to a CCHS hospital for treatment of a broken jaw resulting from an alleged assault.[18]  While trying to provide investigators with details related to her broken jaw, she had difficulty remembering the night, as she was dazed when she fell to the ground.[19]  She conveys that after being hit, she got dizzy, spun around, fell face-

---

[14]  *Id.* at 2-4.

[15]  *Id.* at 4.

[16]  Mot. to Subpoena, Appx. 2, Ex. E, Indi Islam Plea Agreement.

[17]  Mot. to Subpoena, pp. 2-4.

[18]  Mot. to Subpoena, Appx. 1, Ex. A, Indi Islam Timeline, p. 1.

[19]  *Id.* at Appx. 1, Ex. C, May 15, 2018 Interview of Indi Islam, p. 3.

down, and blacked out.[20]  Reportedly, her ride to the hospital, her stay at the hospital, and subsequent discharge from the hospital are difficult for her to remember.[21] Likewise, Ms. Islam's recitation of events surrounding the 2013 Printz Market robbery follow in a similar pattern and at times appear contradictory.  As such, the reliability of her recollection of events has been called into question by Mr. Dale.

Though Ms. Islam's jaw injury—and any lingering effects thereafter—occurred five years after the Printz Market robbery, her ability to recall events prior to the injury undoubtedly raises concerns about the reliability and consistency of her statements to investigators. Thus, a limited inquiry into her health and treatment records *in camera* is necessary to protect Mr. Dale's Sixth Amendment right of confrontation right and to ensure his ability to engage an effective cross-examination of this witness.

## II. DISCUSSION

### A. GUIDANCE UNDER *BURNS* AND *WOOD* COUNSELS WHEN AN *IN CAMERA* REVIEW OF PRIVILEGED AND CONFIDENTIAL RECORDS IS APPROPRIATE.

When seeking production of records in which a third-party has a privacy interest, a criminal defendant must make a "'plausible showing' that the information he is seeking is relevant and material."[22]  Too, that defendant must specifically identify the types and kinds of records sought, as well as a compelling basis for the request.[23]  And, when articulating a compelling basis for the request, he must satisfy

---

[20]  *Id.* at Appx. 2, Ex. D, June 11, 2018 Interview of Indi Islam, p. 28.

[21]  *Id*. at 29-30.

[22]  *Burns*, 968 A.2d at 1025.

[23]  *Id.*

the Court that he is not just "embarking on a fishing expedition into the witness's medical or psychological history."[24]  Upon such a showing, the Court will issue a subpoena for the records to be returned to the Court for an *in camera* review, where the Court will determine whether and which records are relevant and material to the defendant's case.[25]  The process of an *in camera* inspection of a witness's privileged medical records enables the Court to engage in a balancing of protecting the witnesses' right to privacy and confidentiality and protecting the defendant's constitutional confrontation right.[26]

Delaware Criminal Rule 17(c) is, in all relevant respects, consistent with its analog in the Federal Rules of Criminal Procedure.  And both are properly invoked to seek evidence or documents that are admissible at trial.[27]  Rule 17(c) provides for the usual subpoena *duces tecum* or subpoena *ad testificandum*.  It does not, however, provide an additional means of broad discovery.[28]  Accordingly, Rule 17(c) is the vehicle that allows the Court, in a very narrow set of circumstances, to "direct that books, papers, documents or objects designated in the subpoena be produced" *in camera* for the Court's inspection and review to determine if they are due to the parties and their attorneys.[29]

---

[24]  *Id*. at 1025-26.

[25]  *State v. Wood*, 2007 WL 441953 at *6 (Del. Super. Ct. Feb. 1, 2007).

[26]  *Id.*

[27]  *Id.* at *2-3.

[28]  *Id*. at *3.

[29]  *Id.* at *2.

On this score, the three-prong framework articulated by this Court in *State v. Wood* (echoing *Burns*) governs when an *in camera* review is appropriate. That requires a defendant to: (1) identify precisely the records he is seeking and to assert a compelling basis for the request; (2) attempt to procure the consent of the victim/witness for release of the records before resorting to Rule 17 or the Court; and, (3) demonstrate with specificity that the information he is seeking is relevant and material to his defense.[30]

### 1. Dale has precisely identified the records to be produced and has stated a compelling basis for his request.

In *Wood*, the Court found the first prong of the framework was not met because the defendant made "no showing of precisely which records the defense is seeking by the subpoena."[31] Because Wood issued a broad blanket request for the victims' records under Rule 17(c) he could not meet the precision requirement.[32]

Conversely, in *Burns*, our Supreme Court found the defendant *did* meet this requirement because his request seeking "only the factual information contained in [the] therapy records" was "sufficiently precise and narrow."[33] Burns also established that his compelling justification for the records was to use them for impeachment purposes.[34] There, "[t]he crimes with which he was charged had

---

[30] *Id.* at *5-6.

[31] *Id.* at *7. The Court also discussed the timing of Wood's request, which is of no moment here. *Id.*

[32] *Id.*

[33] *Burns*, 968 A.2d at 1026.

[34] *Id.*

occurred years before, there was no physical evidence, the victims had made arguably inconsistent factual statements, and . . . the case would turn largely on the jury's determination of credibility."[35]  Burns made a plausible showing that any prior relevant factual inconsistencies by the witnesses could only be determined from an *in camera* inspection of the witnesses' confidential medical records.[36]

Here Mr. Dale has met the first *Wood* requirement.  He has specifically requested Ms. Islam's treatment records from CCHS, Madre House, the DOC, and the YWCA.[37]  But on this point, the Court finds the *only* records permitted to be produced are those limited to Ms. Islam's discussions of her memory, or lack thereof, of the events in question, and of any diagnosis and/or subsequent treatment following her broken jaw injury that suggest a resultant lack of memory or ability to recall.

Second, Mr. Dale asserts the records are necessary for impeachment purposes because they may "bring to light Islam's tendency to abuse substances and have memory issues, as well as any mental health issues that may affect her ability to be a credible witness."[38]  A fair reading of the record thus far aligns this case more with *Burns* than *Wood*:  Mr. Dale's charged crimes occurred years ago, Ms. Islam has reportedly made numerous inconsistent factual statements, her testimony is critical

---

[35]  *Id.*

[36]  *Id.*

[37]  Mot. to Subpoena, p. 11.

[38]  *Id.*

to the State's case, and the case could turn largely on the jury's determination of her credibility.

### 2. Dale has first attempted to procure the victim's consent for the release of records prior to seeking judicial intervention.

The second requirement under *Wood* is clear and to the point—either the defendant did or didn't seek and receive the victim's consent for production of records in which she may have a privacy inerest. Here, Mr. Dale asserts he requested the relevant materials from the State but never received them.[39] Similarly, Mr. Dale avers he also requested the records from Ms. Islam's counsel directly, who at the time of the motion, responded but has not provided the requested records.[40] Given the circumstance, the Court deems these efforts sufficient under *Wood*.

### 3. Dale has demonstrated with specificity the records sought are relevant and material to his defense.

In *Wood*, the Court found the defendant did not meet the third prong of the test because he failed to make a showing of what he expected the records to establish.[41] There, the defendant was charged with eighteen counts of first-degree rape and two counts of continuous sexual abuse of a child—both crimes involving minor victims.[42] In his subpoenas, and pursuant to Del. Crim. R. 17(c), Wood broadly sought any and all treatment and counseling records from two entities

---

[39]  *Id.*

[40]  *Id.*

[41]  *Wood*, 2007 WL 441953 at *7.

[42]  *Id.* at *1.

regarding his victims and their families with nothing more.[43]  There, the Court found the request too broad to establish what the defendant expected the records to provide in assistance of his defense.[44]

The *Burns* court held that a defendant's burden to meet the third requirement compels a "'plausible showing' that the records sought are material and relevant."[45] Such a showing need convince the Court "that the defendant is not embarking on a 'fishing expedition' into the witness' medical or psychological history."[46]  Burns made a plausible showing that the witnesses' confidential records could contain factual inconsistencies and were relevant and material because "(i) the [victims] had prepared detailed notes of their alleged abuse and destroyed those notes after their [Child Advocacy Center] interviews, and (ii) the [victims] presumably had discussed their interviews at length with their therapist."[47]

Here, Mr. Dale satisfies the third prong of the *Burns-Wood* test because he has identified the relevant healthcare providers, the relevant records, and has substantially demonstrated how each record may be material to his defense.  In turn, the Court finds that any record indicating significant long-term memory loss after her mandible injury, or any record that relates to Ms. Islam's discussion of the crimes central to this case, are no doubt relevant and material to Mr. Dale's defense.

---

[43]  *Id.*

[44]  *Id.* at *7.

[45]  *Burns*, 968 A.2d at 1025.

[46]  *Id.*

[47]  *Id.* at 1026.

### III.  CONCLUSION

Because Mr. Dale made the requisite showings, production of certain of Ms. Islam's records for an *in camera* review is proper.  And so, Mr. Dale's Motion to Subpoena Records and Conduct an *In Camera* Review is **GRANTED**.  As discussed throughout, the limited portions of the records to be produced include only those documents that pertain to Ms. Islam's discussions of her memory, or lack thereof, of the events in question, and any diagnosis and/or subsequent treatment following her broken jaw injury and any memory loss associated therewith.

The records subpoenaed under Rule 17 will be returnable to this Court for an *in camera* inspection whereby the Court will determine which records are relevant and material to the defendant's case and therefore subject to production under *Burns* and *Wood*.  Mr. Dale's counsel shall provide the dates of service or admission for each treatment provider or entity no later than September 30, 2021.  The subpoenas shall issue immediately thereafter.

**IT IS SO ORDERED.**

_____
Paul R. Wallace, Judge

cc: All Counsel via File and Serve